## William H. Stockham et al. v. Eva Adams.

1. RESCISSION OF CONTRACTS—*Representations Which Form No Ground for Rescission.*—The promises of a party to a contract as to what he will do in the future will form no foundation for the rescission of the contract unless such promises amount to misrepresentations of some existing fact.

2. SAME—*Where There is No Misrepresentation of Existing Facts.*— Where there is no intentional misrepresentation of any existing fact which has been relied upon by a party to a contract and which has induced such party to act, there can be no basis for the rescission of the contract.

3. FRAUD—*Willful False Representations.*—To constitute fraud, there must be a willful false representation of existing facts, or the suppression of such existing facts as honesty and good faith require to be disclosed.

4. SAME—*Waiver of the Right to Rescind a Contract for Fraud.*— Where a party desires to rescind a contract on the ground of fraud he must, upon the discovery of the facts constituting the fraud, at once announce his purpose and adhere to it. If he remains silent he will be held to have waived his objection and will be as conclusively bound by his contract, as if the fraud had not occurred.

5. WAIVER—*By Conduct After the Discovery of the Fraud.*—A party to a contract will not be allowed to derive all possible benefits from it and then claim to be relieved from his obligation by a refusal to perform on his own part. If, after discovering the falsity of the representations upon which he has been induced to act, he conducts himself with reference thereto as though the contract were still subsisting and binding upon him, he will be held to have waived all benefit of and right to relief by reason of misrepresentations.

**Bill to Rescind a Contract.**—Appeal from the Superior Court of Cook County; the Hon. ARTHUR H. CHETLAIN, Judge, presiding. Heard in this court at the October term, 1900. Reversed. Opinion filed July 18, 1901.

**Statement by the Court.**—Appellee, through her son and agent, S. A. Adams, purchased 250 shares of stock of the par value of $100 each of the Union Novelty Manufacturing Co., a corporation engaged in buying and selling silverware, clocks and sundry novelties, hereinafter called the Novelty Co., under an agreement with appellants dated October 5, 1898, taking 249 of said shares in her own name and one share in the name of her said son, and paid therefor the sum of $2,500 in cash. May 16, 1899, she filed her bill, by which she sought to rescind her said purchase, offering to return the stock and praying a decree against appellants for the purchase price thereof, with interest from the date of said agreement.

At the time of the purchase of the stock, appellants made and delivered to appellee's son, S. A. Adams, the following instrument in writing, to wit:

" OFFICE OF THE UNION NOVELTY MFG. Co.
CHICAGO, ILL. October 5, 1898.

E. ADAMS:

We hereby individually agree to pay all overdrafts of salesmen, as shown September 30, 1898, which appear below, provided same are not earned or paid by said salesmen by February 1, 1899, the total amount being $1,718.65. It being understood that the commissions on all unfilled orders dated September 30, 1898, or before the commissions on all mail re-orders from customers secured by said salesmen, September 30, or before, shall, when said orders are shipped, be deducted from the overdrafts herein guaranteed." (Here follows detailed list of overdrafts.) "Accepted by

WM. H. STOCKHAM,
W. S. BURLING."

" CHICAGO, ILL., October 5, 1898.

E. ADAMS:

We, the undersigned, having induced E. Adams to buy 249 shares of the stock of the Union Novelty Manufacturing Company at par, she paying $2,490 to the Union Novelty

Manufacturing Company in cash for it, we hereby guarantee the payment of all accounts receivable on the books, not including overdrafts of salesmen, of the Union Novelty Manufacturing Company, on September 30, 1898, said payment to be made on or before January 1, 1899, list of which are hereto attached. We also agree and bind ourselves to buy the above 249 shares of stock of her on January 1, 1900, paying her the full price she paid for it, amounting to $2,490, in cash, if she so desired.

E. Adams agrees that if the inventory and books of the Union Novelty Manufacturing Company will show a loss on the capital stock invested of $5,000 any time between now and January 1, 1900, to turn over said stock to Mr. W. S. Burling and Mr. W. H. Stockham, for the sum of $2,490 cash, with interest from date hereof, if they so desire.

Total sum in attached twelve pages of accounts receivable $10,638.20.

Wm. H. Stockham,<br>
W. S. Burling."

"Chicago, Ill., Oct. 5, 1898.

Mr. S. A. Adams: We hereby agree to employ you as manager with this company at the salary of $30 per week, you agreeing to manage the affairs of this company to the best of your ability. Said position to be retained by you so long as E. Adams holds her stock in this company, which she has this day purchased.

Union Novelty Manufacturing Company,<br>
Wm. H. Stockham, Pres."

The bill alleges that the purchase of the stock was induced by divers fraudulent representations and promises of the appellants with regard to the assets and business of the Novelty Co., and as to the future conduct thereof and its relations to another corporation, The Stockham Manufacturing Co., a manufacturing corporation, hereinafter called the Stockham Co., in which appellants had a controlling interest, all of which representations and promises are set out in detail. It also alleges in substances that after the purchase of the stock appellants fraudulently contrived to render it valueless and manipulated the affairs of the Novelty Co. for the benefit of. the Stockham Co., and by threats and intimidation of said S. A. Adams they procured him, without any consideration, to cancel said instruments of guaranty hereinabove quoted, on the 11th day of March,

1899, and after the guaranties were canceled, appellants notified appellee's said son that they proposed to wind up the business of the Novelty Co. and pay over the proceeds to the Stockham Co.; that they would no longer permit him to exercise any authority over the affairs of the Novelty Co., and thereafter assumed control of all the business and affairs of that company, the details of which notice and acts on their part are set out in the bill.

Appellants answered the bill, denying specifically all allegations as to the fraudulent representations and promises, but admitting the written instruments above quoted and their cancellation; and they deny that there was no consideration for such cancellation, or that the cancellation was induced by any threats or intimidation, as alleged. The answer also avers in substance that the purchase of the stock was made after a full and minute examination of the affairs, property, business and books of account of the Novelty Co. by S. A. Adams as the representative of appellee, and after a full and complete knowledge thereof by him; that said S. A. Adams, by his inattention to business, caused the business of the company to greatly depreciate; that he refused to perform the duties of manager of the company, and for two months prior to the filing of the bill refused to recognize the authority of the company's president or board of directors, and had abandoned the affairs of the company. The answer also admits certain resolutions of the board of directors set out in the bill, which it was alleged had the effect of depriving Adams of any participation in the affairs and business of the company, but denies that such was the purpose of the resolutions, and denies that they had excluded Adams from knowledge of or participation in the affairs and business of the company. By amendment to the answer it is averred that complainant had an adequate remedy at law, and for that reason the bill should be dismissed.

After replication filed the cause was heard by the chancellor upon evidence, both oral and documentary, taken and offered in open court, and a decree entered which in substance finds that said purchase was made as alleged in the

bill, and was induced by false and fraudulent representations made to appellee by appellants, through her son; that prior to the investment appellants falsely and fraudulently represented to appellee that they would so manage the affairs of the Stockham Co., a creditor of the Novelty Co., that the credit theretofore given by the former to the latter should be extended in the future in equal amount; that the indebtedness of the Novelty Co. to the Stockham Co. would be allowed to stand until after the 1st of January following said investment, and that this promise was falsely and fraudulently made to induce appellee to invest; that between the time when the affairs of the Novelty Co. were examined by appellee and the payment of her money, appellants so manipulated the orders and sales upon the books as to increase the apparent assets of the company and diminish the good will and the number of outstanding orders, and that this change was made without the knowledge of and was concealed from appellee; also finds the guaranty agreements quoted in the statement, as well as agreement of employment of S. A. Adams at $30 per week, were made; that S. A. Adams, on October 5, 1898, entered upon the position of manager; that the board of directors consisted of Adams and appellants, and that appellants, immediately after the investment of appellee was made, caused the indebtedness of the Novelty Co. to be largely paid and reduced; that at the maturity of said guaranty agreement, appellants refused to pay the amounts due thereon, repudiated any obligation thereunder, and refused to repurchase said stock, on the ground that the agreement to repurchase was an option and void; that said agreement to repurchase was a valid and subsisting agreement until March 11, 1899; that early in March, 1899, appellants threatened to manage the affairs of the Novelty Co. and the claims of the Stockham Co. so as to render appellee's stock valueless unless she would consent to a cancellation of the guaranty agreement; that before March 11, 1899, appellants knew that the validity of said guaranty agreement had been established by a decision of the Supreme Court of Illinois, but that appellee did not know of such decision, and through fear of said threats, and in

ignorance of said decision, she caused said agreements above quoted to be canceled, except the agreement as to salary; that said cancellations were obtained by appellants as a part of a conspiracy on their part which began by appellants soliciting appellee to invest her money in the said Union Novelty Manufacturing Company stock, and was carried out by means of false representations, threats and concealment of facts and circumstances known to appellants but unknown to appellee, whereby appellants proposed to obtain for their own uses and purposes the sole benefit of said money so paid by appellee for the said stock in the Union Novelty Manufacturing Company; that as soon as said agreements had been canceled, appellants, for the purpose of rendering valueless appellee's stock, voted to themselves salaries, removed the business of the Novelty Co. to the place of business of the Stockham Co., and voted to liquidate and wind up the business and to cease the payment of salary to S. A. Adams, and wrote to salesmen, agents and customers of the Novelty Co. that it was going out of business, and sought thereby to transfer to the Stockham Co. the benefit of the trade and good will of the Novelty Co.; that appellants did take the exclusive control of the assets, business and affairs of the Novelty Co. and diverted the same to the Stockham Co. for their advantage, and prior to the hearing of the cause the entire indebtedness of the Novelty Co. to the Stockham Co. had been extinguished and the latter company was indebted to the former; that the stock of the Novelty Co. is of little value, very much less than the amount paid by appellee for her stock.

The decree further finds that the foregoing acts and representations of appellants to appellee's agent were all a part of a connected scheme entered into by said appellants for the purpose of defrauding the appellee out of the money possessed by the said appellee in September, 1898, and invested by her in the stock of the Novelty Co., as aforesaid; that the said appellants took advantage of the confidence which they instilled in the appellee, through her said agent, and availed themselves of their superior knowledge and the power reserved to them as a majority of the board

of directors and obtained by them through coercion and persuasion of the appellee, through the agent of the appellee, and by means thereof have obtained for their own benefit and converted to their own purposes the greater part of the investment made by the said appellee in the said stock of the Novelty Co., and have rendered said investment substantially valueless.

The decree then provides, among other things not necessary to be here noted, for a surrender of appellee's stock in open court, and decrees that appellants pay to appellee $2,733.50, being the amount of the purchase price thereof and interest at five per cent per annum from October 5, 1898.

From this decree the appeal herein is taken.

BANGS, WOOD & BANGS and JOHN T. RICHARDS, attorneys for appellants.

STEIN & PLATT, attorneys for appellee.

MR. PRESIDING JUSTICE WINDES delivered the opinion of the court.

The theory of the appellee's case is that, by reason of the alleged fraudulent representations of appellants, she had the right to rescind the contract of purchase by her of the 250 shares of stock of the Novelty Co., referred to in the statement, and recover the purchase price thereof and interest from appellants; that she was deceived and defrauded by appellants from the inception of the transaction, and that her agent was induced by threats and intimidation to cancel the appellants' guaranties set out in the statement. No claim is made that the contract of purchase of the stock should be affirmed, that the cancellation of appellants' guaranties should be set aside, or that any relief should be granted based upon the affirmance of the contract of purchase, and a restoration of appellee to her rights thereunder as they existed before the cancellation.

The decree of the chancellor proceeds upon the same theory, viz., that of rescission of the contract of purchase. It finds that appellee was induced to make the purchase by

reason of the false and fraudulent representations made to her son by appellants, and in this connection it should be stated that all the business between appellants and appellee leading up to the purchase of the stock in question at the time of its purchase, and in all their subsequent dealings, appellee was represented by her son, S. A. Adams, who conducted all the business on her behalf. The only fraudulent representations specified in the decree as having been made by appellants are as to promises of what they would do in the event that appellee should invest in the stock of the Novelty Company. All other acts and doings of the appellants found by the decree relate to matters which occurred after the purchase of the stock was completed, except that it is found that they manipulated the orders and sales upon the company's books after they had been examined by appellee and before the purchase was completed, so as to increase the apparent assets of the company, diminish the good will and the number of outstanding orders. It seems too clear for argument that there could be no basis for a rescission of the contract of purchase by reason of any acts or doings of appellants after the contract was fully executed and appellee became the owner of the stock. The evidence is not sufficient to justify the claim that appellee was in any way deceived or influenced to make the purchase by the manipulation by appellants upon the company's books of orders and sales, nor could she have been deceived in that regard, because it appears from the evidence that her agent had made a full and complete examination into the affairs and business of the company and knew the nature and amounts of its assets and liabilities before the purchase was made. He did not rely upon any representations in this respect, but spent several days investigating on his own account, in which he had every facility afforded him by appellants, and he finally took appellants' guaranties as above stated.

The promises of appellants as to what they would do in the future could form no foundation for a rescission of the contract, because they are not such fraudulent representations as can be made the basis of relief of this nature. The representation must be as to some existing fact, not a

promise of what will be done in the future.    Gage v. Lewis,
68 Ill. 604-15; People v. Healy, 128 Ill. 16; Gallagher v.
Brumel, 6 Cowen, 346-52; 2 Pomeroy's Eq. Juris., Sec. 877.

The only evidence tending to show that appellants
made any representations as to matters of existing facts,
which were false, was as to the prices at which goods were
inventoried in taking account of stock preliminary to the
purchase, and as to the extent of business which had been
done in the past by the Novelty Company.    A full exam-
ination of the evidence convinces us that in this respect
there was no intentional misrepresenation by appellants or
either of them, and that if there was any misrepresentation
whatever, it in no way should have misled or deceived ap-
pellee's agent, as it appears he did not rely upon it; he had
full and ample opportunity to examine, and did make a
full examination, as to the price and value of goods and as
to the extent of the company's business.    Moreover, a short
time after the purchase of the stock was perfected, and as
early as November, 1899, appellee's agent, her son, became
entirely familiar with the prices of goods, the nature and
extent of the company's business, and from time to time
thereafter, by repeated acts and declarations on his part,
affirmed the contract of purchase of the stock and insisted
upon appellee's rights as a stockholder in the Novelty Com-
pany for about four months after he had full and complete
knowledge of all the alleged misrepresentations of appel-
lants.    In November or December, 1898, appellee's son
offered to sell her stock to appellants, and we think the
preponderance of the evidence is that he asked the par
value thereof, and in addition one-half the profits which he
claimed had been made by the company between the time
of the purchase and the offer of sale.    S. A. Adams made
an inventory and statement of the company's business on
December 5, 1899, which showed a profit of between $1,800
and $1,900 up to that date, and at that time he claimed
that appellee was entitled as a stockholder to one-half of
these profits.    In conversations at or about that time he
insisted that the company was making money.    There was
more or less friction between appellants and S. A. Adams

regarding the management of the Novelty Company's busi-
ness and the liability of appellants on their guaranties, from
about the middle of November, 1898, up to March 11, 1899,
on which day, after repeated interviews and conferences
between them and their respective attorneys, Mr. Wood
representing appellants, and Mr. Kurz representing S. A.
Adams, they came to a satisfactory settlement of all their
differences.   This resulted in a cancellation by S. A. Adams
for appellee of the guaranty agreements quoted in the state-
ment preceding this opinion, in consideration of a cancella-
tion of an indebtedness of the Novelty Company of $3,200
to the Stockham Company.   It appears that in these inter-
views appellants had claimed that the agreement by appel-
lants to repurchase appellee's stock was an option contract,
and therefore invalid, and S. A. Adams had been so advised
by his attorney, Mr. Kurz.   The day before these agree-
ments were canceled, appellants ascertained that a decision
of the Supreme Court of Illinois had just been rendered
which established the validity of the purchase agreement.
This decision was unknown to S. A. Adams and to his attor-
ney, and appellants, acting upon a knowledge of the decision,
without informing Adams of it, induced him to cancel the
guaranty agreements, as above stated.   Appellants, how-
ever, made no statement or representation whatever to
Adams with regard to the decision in question which in-
duced this action on his part.   The same day, and after the
agreements had been canceled, Adams was informed of the
Supreme Court decision, and, as the preponderance of the
evidence clearly establishes, expressed himself as entirely
satisfied with the adjustment of differences which had been
made between him and appellants and with the cancellation
of the agreements.   He also then expressed himself as being
willing to go on with appellants, co-operate with them as
to the future conduct of the company's business, and did do
so for some time afterward.

There then being no intentional misrepresentation of any
existing facts which was relied upon by appellee and which
induced the purchase of the stock by her, there is no basis

for a rescission of the contract. Mitchell v. Deeds, 49 Ill. 418–22; Tucker v. Downing, 76 Ill. 71–97; Schwabaker v. Riddle, 99 Ill. 343–8; Jones v. Foster, 175 Ill. 459–68, and cases cited.

In the Mitchell case, *supra*, the court say : " To constitute fraud there must be a willful false representation of facts or the suppression of such facts as honesty and good faith require to be disclosed;" and that where the representation was made in good faith, an essential ingredient of fraud was wanting.

In the Tuck case, *supra*, which was a bill to procure the cancellation of a note alleged to have been obtained by fraud, the court held that, in order to justify relief based on a fraudulent misrepresentation, " it must be a material matter, or one important to the interests of the party complaining; for if it was of an immaterial thing, or if the other party did not trust to it, or if it was a matter of opinion or fact equally open to the inquiries of both parties, and in regard to which neither could be presumed to trust the other, there is no reason for equity to interfere on the ground of fraud. * * * It must be something in regard to which the one party places a known trust or confidence in the other."

In the Schwabaker case, *supra*, the court say:

" A knowledge of the falsity of the representations must rest with the party making them and he must use means to deceive."

In the Jones case, *supra*, the court say :

"It is well settled that, in order to constitute such a fraudulent representation as will induce a court of equity to set aside an executed deed, it must not only appear that the representations are untrue, but also that the party making them knew them to be untrue at the time of making them."

But if we are wrong in our conclusion that the evidence fails to show misrepresentations of the appellants which were relied on by appellee and induced the contract, still there could be no rescission of it by reason of the fact of appellee's repeated re-affirmances of her purchase and

insistence through her agent, S. A. Adams, for nearly four months, upon her rights as a stockholder in the Novelty Company, after full knowledge of all the alleged fraud. She will be held by these acts to have waived all right of rescission and will be bound by her purchase. Grymes v. Sanders, 93 U. S. 55–62; 2 Pomeroy's Eq. Juris., Sec. 897; Greenwood v. Fenn, 136 Ill. 146–58; Bavarian B. Co. v. Farrar, 163 Ill. 471; Follett v. Brown, 188 Ill. 244–47; C. T. & S. Bk. v. Anderson, 93 Ill. App. 347–54, and authorities there cited.

In the Grymes case, *supra*, the rule in this respect is thus stated:

" Where a party desires to rescind upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent and continue to treat the property as his own, he will be held to have waived the objection, and will be conclusively bound by the contract, as if the mistake or fraud had not occurred. He is not permitted to play fast and loose. Delay and vacillation are fatal to the right which had before subsisted."

In the section quoted from Mr. Pomeroy, *supra*, the author in speaking on this subject says:

" The person who has been misled is required, as soon as he learns the truth, with all reasonable diligence to disaffirm the contract, or abandon the transaction, and give the other party an opportunity of rescinding it, and of restoring both of them to their original position. He is not allowed to go on and derive all possible benefits from the transaction, and then claim to be relieved from his own obligations by a rescission or a refusal to perform on his own part. If, after discovering the untruth of the representations, he conducts himself with reference to the transaction as though it were still subsisting and binding, he thereby waived all benefit of and relief from the misrepresentations."

The rule as stated in the above authorities is quoted with approval by the Supreme Court in the Greenwood case, *supra*, where it was held that a complainant who sought to set aside an exchange of properties by reason of false and fraudulent representations, should act promptly after becoming aware of the fraud, and would not be allowed to

rescind the transaction after full knowledge of the facts relating to the alleged fraud, where he continued to treat the property exchanged as his own and to avail himself of its use and the profits thereof.

In the recent case of Follett, *supra*, the above authorities are considered, and the court say :

" It is a settled principle in equity that one who has been misled and defrauded shall not be permitted, after he learns of the fraud, to stand passive and speculate upon the election that the law gives to him, either to rescind the contract or waive the fraud, as the events of the future may determine it to be profitable, or otherwise, for him to do."

The decree finds that appellants entered into a scheme for the purpose of defrauding appellee out of her money by procuring her to invest it in the stock of the Novelty Company, but there is no evidence in the record upon which to base such a finding except that which has been hereinabove referred to, and which we think is insufficient to justify it. The fact that the evidence shows acts of appellants done long after the stock was purchased, which, with all the other evidence, it is claimed, establishes that they had formed such a scheme, is not, in our opinion, of controlling importance and does not justify the finding. We think these acts are explainable in view of the undisputed fact shown by the record, that there were frequent differences between appellants and S. A. Adams as to the manner in which the business of the company should be conducted, and the further fact that under Adams' management the business had proved unprofitable. If appellee has been defrauded by any acts of appellants done since the purchase of the stock, she has her remedy therefor; but not by means of a rescission of the purchase contract.

Other matters urged upon our attention by the briefs and arguments of counsel, we deem it unnecessary to consider in view of the conclusions reached.

The decree of the Superior Court is reversed, and that court is directed to dismiss the bill for want of equity. Reversed.